**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. THOMAS AND ST. JOHN**

| | | |
|---|---|---|
| THE WEST INDIAN COMPANY LIMITED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:20-cv-0011 |
| | ) | |
| YACHT HAVEN USVI, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

ATTORNEYS:

**Christopher Allen Kroblin**
**Shari Natalya D'Andrade**
Kellerhals Ferguson Kroblin PLLC
St. Thomas, U.S.V.I.
        *For Plaintiff The West Indian Company Limited,*

**Matthew J. Duensing**
Duensing & Casner
St. Thomas, U.S.V.I.

**Adam Brenner Gilbert**
**Thomas Michael Mealiffe**
Nixon Peabody LLP
New York, N.Y.
        *For Defendant Yacht Haven USVI LLC.*

## <u>MEMORANDUM OPINION</u>

**MOLLOY, Chief Judge**

        **THIS MATTER** is before the Court *sue sponte* on the question of whether this Court has subject matter jurisdiction in this matter. On October 8, 2021, the Court issued an Order requiring the parties to brief the issue as to whether there is diversity jurisdiction in this case. Plaintiff, The West Indian Company Limited ("WICO"), filed its initial brief on October 22, 2021.

Defendant, Yacht Haven USVI, LLC ("Yacht Haven"), filed a response brief on November 5, 2021. WICO filed a reply on November 22, 2021. For the reasons set forth herein, the Court finds that it has subject-matter jurisdiction in this case.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On December 19, 2019, WICO filed a three-count complaint in this matter in the Superior Court of the Virgin Islands. *See* ECF No. 1-2. In its complaint, WICO alleges tortious interference with contracts, tortious interference with prospective business relations, and seeking declaratory judgment that WICO did not breach its contractual relations with Yacht Haven – the latter based on a related lawsuit in New York state court. *See generally id.*

On January 31, 2020, this case was removed by Yacht Haven on the basis of diversity jurisdiction. *See generally* ECF No. 1. Yacht Haven's notice of removal was later amended to more specifically plead the citizenship of its members. *See* ECF No. 24. While the WICO moved to remand this matter to the Superior Court on the basis of Yacht Haven's failure to plead the citizenship of its members with sufficient specificity, *see generally* ECF No. 8, that motion was mooted by Yacht Haven's subsequent amendments. *See* ECF No. 23. WICO has not filed a subsequent motion to remand.

On October 8, 2021, the Court *sua sponte* ordered the parties to file briefs on the issue WICO's citizenship, specifically as to whether WICO, as a public entity and instrumentality of the Government of the Virgin Islands, has citizenship for the purposes of establishing diversity jurisdiction. *See generally* ECF No. 25. In response, the parties have fully briefed the issue.

## II. LEGAL STANDARD

Pursuant to 28 U.S.C. § 1441(a), a defendant may remove an action filed in state court to a federal court with original jurisdiction over the action. Once an action is removed, a plaintiff may challenge removal by moving to remand the case back to state court. 28 U.S.C. § 1447(c). A case that is removed shall be remanded to state court "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction." *Id.* To defeat a motion to remand for lack of subject-matter jurisdiction, the defendant bears the burden of showing that the federal court has jurisdiction to hear the case. *Samuel-Bassett v. KIA Motors Am., Inc.*, 357 F.3d 392, 396 (3d Cir. 2004); *Abels v. State Farm Fire & Cas. Co.*, 770 F.2d 26, 29 (3d Cir. 1995) (citing *Pullman Co. v. Jenkins*, 305 U.S. 534, 537 (1939)). Generally, where the decision to remand is a close one, "the removal statute should be strictly construed and all doubts should be resolved in favor of remand." *Abels*, 770 F.2d at 29 ("[L]ack of jurisdiction would make any decree in the case void and the continuation of the litigation in federal court futile[.]").

The diversity statute, 28 U.S.C. § 1332, provides, in pertinent part, that:

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—

    (1) citizens of different States;

    . . .

. . .

(c) For the purposes of this section and section 1441 of this title—

    (1) a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business . . .

28 U.S.C. § 1332(a). Diversity jurisdiction "requir[es] 'complete diversity between all plaintiffs and all defendants' . . . ." *Lincoln Ben. Life Co. v. AEI Life*, LLC, 800 F.3d 99, 101 (3d Cir. 2015) (quoting *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 89 (2005)). "This means that, unless there is some other basis for jurisdiction, 'no plaintiff [may] be a citizen of the same state as any defendant.'" *Id.* (quoting *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 419 (3d Cir. 2010)).

With respect to the citizenship of corporations, "the phrase 'principal place of business' refers to the place where the corporation's high level officers direct, control, and coordinate the corporation's activities." *Hertz Corp. v. Friend*, 559 U.S. 77, 80 (2010). "It is the place that Courts of Appeals have called the corporation's 'nerve center.'" *Id.* at 93. "[I]n practice [the principal place of business] should normally be the place where the corporation maintains its headquarters--provided that the headquarters is the actual center of direction, control, and coordination, i.e., the 'nerve center,' and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion)." *Id.*

"[A] limited liability company, as an unincorporated business entity, should be treated as a partnership for purposes of establishing citizenship." *Zambelli Fireworks Mfg. Co.*, 592 F.3d at 420. "Partnerships and other unincorporated associations . . . are not considered 'citizens' as that term is used in the diversity statute." *Swiger v. Allegheny Energy, Inc.*, 540 F.3d 179, 182 (3d Cir. 2008) (citing *Carden v. Arkoma Assocs.*, 494 U.S. 185, 187–92 (1990)). When determining the citizenship of unincorporated associations, "courts . . . look to the citizenship of all the . . . members of . . . [the] unincorporated association[] to determine whether the federal district court has diversity jurisdiction." *Id.* "[T]he complete diversity requirement

demands that all [members] be diverse from all parties on the opposing side." *Swiger*, 540 F.3d at 183. Significantly, "where an LLC has, as one of its members, another LLC, 'the citizenship of unincorporated associations must be traced through however many layers of partners or members there may be' to determine the citizenship of the LLC." *Zambelli Fireworks Mfg. Co.*, 592 F.3d at 420.

A government entity, however, has no citizenship for the purpose of determining diversity jurisdiction. *See Daley v. Dowdye*, 571 F. App'x 128, 129 (3d Cir. 2014) ("[A] Territory of the United States, which is considered a state pursuant to § 1332(d), [] cannot be considered a citizen for purposes of establishing diversity of citizenship jurisdiction.") (quoting *Brown v. Francis*, 75 F.3d 860, 865 (3d Cir. 1996)); *accord Agullard v. Principal Life Ins. Co.*, 685 F. Supp. 2d 947, 952 (D. Ariz. 2010) ("[S]tates and state agencies or instrumentalities have no state 'citizenship' for purposes of diversity jurisdiction.") (citing *Morongo Band of Mission Indians v. Cal. State Bd. of Equalization*, 849 F.2d 1197, 1200 (9th Cir. 1988)).

### III. DISCUSSION

It is well settled that challenges to subject-matter jurisdiction may be raised "at any point in the litigation, and courts must consider them *sua sponte*" if not raised by the parties. *Fort Bend Cnty. v. Davis*, ––– U.S. –––, 139 S. Ct. 1843, 1849 (2019) (quoting *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012)) (internal quotation marks omitted). Indeed, "tardy jurisdictional objections occasion wasted court resources and disturbingly disarm litigants." *Id.* (quoting *Sebelius v. Auburn Reg. Med. Cntr.*, 568 U.S. 145, 153 (2013)) (internal quotation marks omitted).

A court evaluating a challenge to diversity jurisdiction in Rule 12(b)(1) motion or a motion to remand "must determine whether the challenge is a facial attack or a factual attack." *GBForefront, L.P. v. Forefront Mgmt. Grp., LLC*, 888 F.3d 29, 35 (3d Cir. 2018). Although the issue of diversity is raised *sua* sponte here, the Court nevertheless must determine the appropriate standard to apply. The Third Circuit has instructed:

> A facial attack ... is an argument that considers a claim on its face and asserts that it is insufficient to invoke subject matter jurisdiction of the court because, for example, ... there is no indication of a diversity of citizenship among the parties[.] A factual attack, on the other hand, is an argument that there is no subject matter jurisdiction because the facts of the case ... do not support the asserted jurisdiction.

*Id.* (quoting *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357–58 (3d Cir. 2014)) (alterations in original) (quotations and internal citations omitted). Put another way, a facial attack "challenges subject matter jurisdiction without disputing the facts alleged in the notice of removal, and it requires the court to consider the allegations as true" whereas a factual attack challenges "the factual allegations underlying the assertion of jurisdiction, and involves the presentation of competing facts." *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 811 (3d Cir. 2016) (quoting *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016)) (cleaned up).

Here, WICO initially mounted a facial challenge to the Court's subject matter jurisdiction, arguing that Yacht Haven failed to plead the citizenship of its members with sufficient specificity. *See generally* ECF No. 8. That motion was mooted when Yacht Haven subsequently amended its notice of removal to plead its members more specifically. *See generally* ECF No. 23. On October 8, 2021, the Court raised the issue of WICO's citizenship, or lack thereof, *sua sponte. See* ECF No. 25. Therein, the Court specifically questioned the fact of

WICO's status as a public entity, how that fact impacted diversity jurisdiction, and ordered the parties to brief the issue. Therefore, the Court's October 8, 2021 Order is clearly interpreted as raising a *sua sponte* factual challenge to subject matter jurisdiction.

Facing a factual challenge, the party asserting jurisdiction has "the burden of proof to establish diversity jurisdiction by a preponderance of the evidence[,]" *GBForefront*, 888 F.3d at 35 (quoting *Aichele*, 757 F.3d at 358) (alterations in original), and "the court 'is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case[,]' " *Davis*, 824 F.3d at 346 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).

Despite this, Yacht Haven provides no evidence of WICO's citizenship for the Court to consider, instead directing the Court to the fact that WICO has taken different positions in the past regarding its public or private status, as if to judicially estop WICO from claiming public status in the instant proceeding. *See generally* ECF No. 27-1 and 27-2. This argument is fatally flawed – the Court cannot "forge ahead on blind principle without jurisdiction to do so" and "allow judicial estoppel to substitute for subject-matter jurisdiction." *Hansen     v.     Harper Excavating, Inc.*, 641 F.3d 1216, 1227-28 (10th Cir. 2011). Therefore, ordinarily, Yacht Haven would summarily fail to survive this challenge to subject-matter jurisdiction.

The Court notes, however, that the crux of the issue at hand is not a dispute over the jurisdictional facts themselves but the legal significance of those facts. *Cf. GBForefront*, 888 F.3d at 35 n.8 (noting that a party's "factual attack ultimately came down to a question of law on how to determine the citizenship of certain trusts"). Whether WICO is an arm of the Government of the Virgin Islands is a legal question. *See generally Doolin v. Kasin*, 424 Fed. App'x 106 (3d Cir. 2011). If Plaintiff is an alter ego of the Government of the Virgin Islands

under the Third Circuit's legal test, Plaintiff has no citizenship for diversity purposes and this matter must be remanded to state court due to lack of federal subject matter jurisdiction. 28 U.S.C. § 1447(c). But if Plaintiff is not the Government of the Virgin Islands' alter ego, Defendant has met its burden of establishing federal diversity jurisdiction over this matter. Defendant has alleged complete diversity between itself, a limited liability corporation whose members are other limited liability corporations, with their ultimate members being residents of Illinois, New York, South Carolina, and the Cayman Islands, and Plaintiff, a purported citizen of the Virgin Islands, and the parties do not dispute that the amount in controversy exceeds $75,000. *See* ECF No. 24, at 3-5.

In their responsive briefs to the Court's October 8, 2021 Order, the parties point to the same legal test as voiced by the Third Circuit in *Doolin v. Kasin*, 424 Fed. App'x 106 (3d Cir. 2011). *See* ECF No. 27, at 9; ECF No. 26, at 4 (While WICO mistakenly cites "*Daley*" as the case name, the reporter citation, as corroborated by the 'quoting' parenthetical, indicate that WICO intended to say "*Doolin*."). In *Doolin*, the Third Circuit discusses that although "a State is not a citizen for purposes of diversity jurisdiction . . ., the Supreme Court has recognized that a political subdivision of a state, unless it is simply the arm or alter ego of the State, is a citizen of the State for diversity purposes." *Doolin*, 424 Fed. App'x at 109 (quoting *Moor v. Alameda County*, 411 U.S. 693, 717 (1973)) (internal marks omitted).

To establish whether an entity is a state's alter ego for diversity purposes, the Third Circuit employs the same test used to evaluate an entity's entitlement to Eleventh Amendment immunity. *Id.* ("[A] court must perform the same analysis as is required to determine Eleventh Amendment immunity" to determine if an entity is an alter ego of the state for diversity

purposes (citing *Blake v. Kline*, 612 F.2d 718, 726 (3d Cir. 1979))); *Gibson-Homans Co. v. New Jersey Transit Corp.*, 560 F. Supp. 110, 112 (D.N.J. 1982) ("In determining whether or not [an entity] is the alter ego of the State for diversity purposes, the Court must perform the same analysis required in order to determine whether New Jersey Transit is immune from suit under the Eleventh Amendment.").

In *Fitchik v. New Jersey Transit Rail Operations*, the Third Circuit articulated a consolidated three-factor test to evaluate whether an entity is an arm of the state entitled to Eleventh Amendment Immunity. 873 F.2d 655, 659 (3d Cir. 1989). Under the *Fitchik* regime, a court must consider: "(1) whether the payment of the judgment would come from the state; (2) what status the entity has under state law; and (3) what degree of autonomy the entity has." *Karns v. Shanahan*, 879 F.3d 504, 513 (3d Cir. 2018) (quoting *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 546 (3d Cir. 2007), amended on reh'g (Mar. 8, 2007)); *see Fitchik*, 873 F.2d at 659.[1] The court must then balance these factors, affording them equal weight. *See Karns*, 879 F.3d at 513–15 (emphasizing that "none of the three *Fitchik* factors is 'predominant'" (quoting *Cooper v. Se. Pa. Transp. Auth.*, 548 F.3d 296, 301 (3d Cir. 2008))). Importantly, "each case must be considered on its own terms, with courts determining and then weighing the qualitative strength of each individual factor in the unique factual circumstances at issue." *Karns*, 879 F.3d at 514. The Court will address each subfactor in turn.

---

[1] The Court will refer to these factors as (1) the funding factor; (2) the legal status factor; and (3) the autonomy factor.

### A. The Funding Factor.

Addressing the first prong, WICO acknowledges that taxpayer funds are not used in WICO operations, but argues that WICO is required to contribute to the Virgin Islands Government's general fund, and therefore any judgment against WICO would result in a corresponding reduction in the general fund. ECF No. 26, at 4-5. Yacht Haven counters that this prong weighs heavily against WICO because the "source of money that would pay the judgment would be Yacht Haven, not WICO." ECF No. 27, at 10 (internal quotations and citations omitted). This being because WICO, not Yacht Haven, commenced the instant suit.

Both parties' proposed interpretations of this prong would yield absurd results. Yacht Haven correctly notes that WICO's argument would lead to an identical analysis whether WICO was public or private – any private corporation, if forced to pay a judgment, would have decreased income, and pay correspondingly less taxes. *See* ECF No. 27 at 10-11. This is no justification for finding WICO to be an arm of the Government of the Virgin Islands any more than it is to find any private corporation to be an arm of the Government of the Virgin Islands. In response, Yacht Haven suggests that the question of whether a public entity has citizenship for diversity purposes would depend on whether the public entity was the plaintiff or the defendant in each suit. In applying the first factor, "the relevant inquiry is not merely a 'formalistic question of ultimate financial liability.' Instead, the relevant inquiry is the 'entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance.' " *Benn*, 426 F.3d at 139 (quoting *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 431 (1997)) (internal citations omitted). Yacht Haven seeks to constrain the Court's inquiry to that same formalistic question.

Rather, the first factor asks whether state money would be used to cover a legal judgment against the entity in question. *Patterson v. Pennsylvania Liquor Control Bd.,* 915 F.3d 945, 950 (3d Cir. 2019) (citing *Fitchik*, 873 F.3d at 659). The Third Circuit has articulated three subfactors relevant to the assessment of the first *Fitchik* factor: "(1) a state's legal obligation to pay a money judgment entered against the entity; (2) whether the agency has money to satisfy the judgment; and (3) whether there are specific statutory provisions that immunize the state from liability for money judgments." *Id.* at 951 (citing *Fitchik*, 873 F.2d at 659). While this analysis is certainly complicated by WICO's status as a plaintiff, rather than defendant, the Court still finds the source of the money factor to be indicative of WICO's relationship with the Government of the Virgin Islands, and consequently, its alter-ego status. *See New Jersey Dep't of Env't Prot. v. Nestle USA, Inc.*, 2007 WL 703539, at *2 n.1 (D.N.J. Mar. 2, 2007) ("[T]he first factor is not helpful in this analysis because it is more suited to litigation in which an agency is a defendant in an action.").

### 1. *The Virgin Islands' Legal Obligation to Pay a Money Judgment*

A court evaluating the funding factor must examine the state's legal *obligation* to indemnify an entity in case of an adverse legal judgment against that entity. *See Patterson*, 915 F.3d at 951. The Third Circuit has "consistently rejected the argument that a State's voluntary choice to pay a state-affiliated entity's liabilities . . . favors Eleventh Amendment immunity." *Maliandi v. Montclair State Univ.*, 845 F.3d 77, 87 (3d Cir. 2016).

The Third Circuit's analysis in *Maliandi* is instructive. In that case, the Court was evaluating whether Montclair State University ("Montclair" or "MSU"), then governed as a state college by N.J.S.A § 18A:64-1 *et seq.*, was entitled to immunity as an arm of the state. *See*

*generally, id.* The Court stressed that a state's overarching legal liability for an entity's debts is the "key factor" in a court's funding evaluation.[2] *Id.* at 87 (quoting *Febres v. Camden Bd. Of Educ.*, 445 F.3d 227, 236 (3d Cir. 2006)).

As with Montclair, the Court is aware of no all-encompassing legal obligation that the Virgin Islands pay judgments against WICO. The Government of the Virgin Islands may be responsible for the liability of WICO employees acting in the scope of their employment, *see* 33 V.I.C. § 3408, but this does not sway the Court's analysis here for the reasons articulated by the Third Circuit in *Maliandi*. In *Maliandi*, the Third Circuit concluded:

> Even assuming that New Jersey would have the legal obligation to pay judgments against MSU under the Tort Claims Act and the Contractual Liability Act ... the exceptions embodied in those statutes only prove the rule, confirming the absence of an overarching legal obligation on the part of the State.

*Maliandi*, 845 F.3d at 88. The Government of the Virgin Islands' similar lack of overarching legal obligation to cover adverse judgments against WICO suggests WICO is not an arm of the Government of the Virgin Islands. *See id.* ("Absent such obligation, this subfactor counsels against treating MSU as an arm of the State.").

### 2. *Alternative Sources of Money*

The second subfactor of the funding analysis asks whether WICO has sufficient non-state funds to cover an adverse judgment against it. *Id.* Consideration of alternative sources of funding "necessarily involves a review of the percentage of funds [WICO] receives from the State" as well as "the extent to which the State retains ownership over the funds it appropriates

---

[2] While the Third Circuit found the funding factor weighed against immunity, the Court ultimately concluded that, on balance, the *Fitchik* factors counselled in favor of a finding that Montclair was entitled to immunity.

and whether the entity is insured against money judgments." *Id.* While "there is no hard-and-fast rule about how much funding from the State is enough to trigger immunity," the Third Circuit has "regularly determined that alternative sources of funding—even where only a small part of the entity's overall budget—counsel against immunity." *Id.*

Again, the Court's review of the Virgin Islands Code reveals no substantial legislative allocation of funds from the Government of the Virgin Islands to WICO. To the contrary, WICO has numerous sources of revenue including the administration of a cruise ship dock and, in the instant case, leasing real property to corporate entities such as Yacht Haven. *See generally* ECF No. 1-2. Moreover, the financial relationship between the WICO and the Government of the Virgin Islands includes an annual payment of the greater of ten percent of WICO's revenues or $700,000.00 to the Government of the Virgin Islands. *See St. Croix Avis v. W. Indian Co., Ltd.*, 71 V.I. 39, 61 (Super. Ct. 2019) (summarizing the legislative history of WICO's required financial contributions to the General Fund in lieu of taxes).

Further, there is no indication of continued state ownership of appropriations once allocated to WICO. If, once deposited, state-appropriated funds "belong" to an entity, judgments paid out using those funds are considered to be satisfied with the entity's, not the state's, money. *Febres*, 445 F.3d at 234. Although WICO must comply with certain revenue reporting requirements and is subject to audit by the Virgin Islands Legislature, Act No. 6530, 2002 V.I. Sess. L. 357 (June 21, 2002), and despite the fact that WICO's acquisition was funded by Public Finance Authority funds, Act No. 5826, § 2, 1993 V.I. Sess. L. 10, 12 (Mar. 31, 1993), these requirements do not show proof of government control. *See Maliandi*, 845 F.3d at 89-90 (concluding that because Montclair "may spend state-appropriated funds as it sees fit[,]" the

requirement that the school "spend its funds within the general parameters of the State's overall budget appropriations" was a "minimal constraint" and did not indicate continued state ownership of funds allocated to MSU (citation and internal quotation omitted)). WICO, unlike many other Virgin Islands government agencies, is "empowered to undertake any lawful act or activity permitted under the Company Charter and permissible for a general business corporation under the general corporation laws of the Virgin Islands." *St. Croix Avis*, 71 V.I. at 61 (quoting Act No. 5826, § 4, 1993 V.I. Sess. L. 10, 12 (Mar. 31, 1993)). The Court therefore concludes that this second subfactor weighs heavily against WICO being an arm of the Government of the Virgin Islands.

### 3. *State Immunity from Liability*

"The third subfactor stands for the simple proposition that where the State has expressly immunized itself from the entity's liabilities, it thereby indicates the entity is not an arm of the State . . . ." The Third Circuit has considered statutes such as N.J.S.A. § 18A:65-8 ("No provision in this chapter contained shall be deemed or construed to create or constitute a debt, liability, or a loan or pledge of the credit, of the state of New Jersey.") to be demonstrative of broad state immunity against liability. *Kovats*, 822 F.2d at 1310–11 (evaluating whether Rutgers was an arm of the state entitled to Eleventh Amendment immunity); *see Maliandi*, 845 F.3d at 90 (characterizing N.J.S.A. § 18A:65-8 as affording the state "sweeping statutory immunity" against liability for judgments against Rutgers).

The Government of the Virgin Islands enjoys similar "sweeping statutory immunity" stemming from the structure of WICO's acquisition. *Id.* Strictly speaking, WICO's corporate shares were transferred to the Virgin Islands Public Finance Authority ("PFA"). Act No. 5826 §

2(c), 1993 VI Sess. L. at 12 ("The Governor shall transfer the shares of common stock of the Company acquired under this section to the Virgin Islands Public Finance Authority."). The purchase itself was funded by PFA revenue bonds. *Id.* at §3. The PFA was created as a "public corporation and autonomous governmental instrumentality of the Government of the Virgin Islands." 29 V.I.C. § 918. Further, "[t]he debts, obligations, contracts, bonds, receipts, expenditures, accounts, funds, facilities, and property of the [PFA] shall be deemed to be those of the [PFA] and not those of the Government of the Virgin Islands… ." *Id.* Considering that WICO was acquired on PFA issued debt, and WICO's shares were transferred to the ownership of the PFA, the Government of the Virgin Islands is similarly immune by statute from any judgment against WICO.

Although WICO enjoys similar protections enjoyed by the Government of the Virgin Islands in civil actions, *see* 5 V.I.C. § 479(a)(4) (exempting "[a]ll property of any public corporation of the government of the Virgin Islands" from execution on a judgment), these protections are not sufficient to sway the Court in the presence of an express grant of statutory immunity  In *Maliandi*, the Third Circuit found that the absence of such overarching immunization, even in the presence of immunity from contractual debts incurred by Montclair, tended to favor treating Montclair as an arm of the State. *Maliandi*, 845 F.3d at 90. The Court finds the inverse in this case and finds that this subfactor weighs strongly against considering WICO an arm of the Government of the Virgin Islands.

In sum, each of the three subfactors tip decisively against treating WICO as an arm of the Virgin Islands Government. The Court therefore concludes that the funding factor counsels strongly against a finding that WICO is an alter-ego of the Government of the Virgin Islands.

### B. The Legal Status Factor

The second *Fitchik* factor calls for an examination of "whether the entity is treated as an arm of the State under state case law and statutes." *Id.* at 83. Relevant subfactors include: "(1) how the law treats the agency generally; (2) whether the agency is separately incorporated; (3) whether the agency can sue and be sued in its own right; (4) and whether it is immune from state taxation." *Patterson*, 915 F.3d at 953 (citing *Fitchik*, 873 F.2d at 659).

In its responsive brief, WICO argues that it was acquired "to benefit the Territory[,]" and is a "public entity operating on the Territory's behalf." ECF No. 26, at 5 (citing Act 5826 and *St. Croix Avis*, 71 V.I. at 61). WICO additionally cites *Sprauve* and *V.I. Taxi Ass'n* for the threadbare proposition that other courts have held WICO to be a public entity in other contexts. No further discussion is provided, however, and none of the cited cases address the instant analysis.

Yacht Haven counters, without authority, that "[w]hat controls is how WICO acts – particularly here, where it is a private commercial litigant pursuing damages from a private entity for alleged torts and allegations of contractual breaches." ECF No. 27, at 11. Yacht Haven goes on to distinguish the instant case from *Sprauve*, *V.I. Taxi Ass'n,* and *St. Croix Avis*, all with the argument that WICO bringing its instant claims are "private and commercial acts rather than public or governmental acts[.]" *See generally id.* at 11-18 (quotation provided without citation in original). Yacht Haven's argument undermines itself, however, claiming that "WICO waive[d] sovereign immunity" in its dealings with Yacht Haven, implying that WICO had sovereign immunity in the first instance. *Id.* at 18.

Again, Yacht Haven's argument would lead to absurd results, apparently suggesting that *any* public entity that engages in actions such as a leasing real estate would summarily forfeit its status as a public entity. The correct analysis is far more nuanced, and is neither cited nor addressed in full by Yacht Haven, or WICO for that matter. The parties focus on the singular, overbroad question of WICO's status under territorial law. Instead, the Court will consider the subfactors prescribed by *Fitchik* and its progeny.

### 1. WICO's General Treatment Under Virgin Islands Law

When analyzing how state law treats an entity generally, courts take stock of: "(1) explicit statutory indications about how an entity should be regarded; (2) case law from the state courts—especially the state supreme court—regarding an entity's immunity or status as an arm of the State; and (3) whether the entity is subject to laws for which the State itself has waived its own immunity (such as state tort claims acts)." *Bradley v. W. Chester Univ. of Pa. State Sys. of Higher Educ.*, 880 F.3d 643, 655 (3d Cir. 2018) (quoting *Maliandi*, 845 F.3d at 91). Here, the evidence points toward WICO's treatment as an arm of the Government.

Three different courts have held that The West Indian Company Limited ("WICO") is a public entity and instrumentality of the Government of the Virgin Islands. *See Sprauve v. West Indian Co.*, 799 F.3d 226, 235 (3d Cir. 2015) ("Because WICO was established as a government corporation pursuant to a special Act of the Virgin Islands Legislature to further government objectives, and WICO is permanently and completely controlled by government appointees, it is part of the government for purposes of the constitutional claims and section 1983 claims brought by Sprauve and Smith"); *V.I. Taxi Ass'n v. W. Indian Co.*, 66 V.I. 473, 486 (2017) ("The first proposition in section 8(b) of Act 5826 establishes WICO as a public entity . . . ."); *St. Croix*

*Avis v. West Indian Co., Ltd.*, 71 V.I. 39, 58 (V.I. Super. 2019) ("There is no dispute that WICO is a 'public corporation and governmental instrumentality of the Government of the Virgin Islands of the United States' and a 'public entity operating on behalf of the Government, rather than a private corporation.' " (quoting Act No. 5826, § 8(b), 1993 V.I. Sess. L. at 13)).

Moreover, each of these decisions rely on explicit statutory authority establishing WICO as a "public corporation and government instrumentality of the Government of the Virgin Islands of the United States . . .operating on behalf of the Government, rather than a private corporation… ." Act No. 5826, § 8(b), 1993 V.I. Sess. L. at 13. Lastly, as discussed *supra*, WICO is treated as part and parcel of the Government of the Virgin Islands for purposes of the Virgin Islands Tort Claims Act. *See* 33 V.I.C. § 3401 *et seq.* Therefore, this subfactor counsels in favor of considering WICO to be an arm of the Government of the Virgin Islands.

### 2. Incorporation, Ability to Sue and Be Sued, & Immunity from Taxation

First, "[s]eparate incorporation disassociates an entity from its State and thus weakens its claim to Eleventh Amendment immunity." *Maliandi*, 845 F.3d at 93. While WICO is separately incorporated, this distinction is superficial in practice. Following the acquisition of WICO by the Government of the Virgin Islands, the Government "transferred 100% of WICO's shares to the Virgin Islands Public Finance Authority ("PFA"), a public corporation and instrumentality created by the Government of the Virgin Islands." *V.I. Taxi Ass'n*, 66 V.I. at 479; *see also Sprauve*, 799 F.3d at 227. "The PFA is run by a board of directors appointed by the Governor of the Virgin Islands, with the advice and consent of the Virgin Islands Legislature. WICO is run by its own board of directors, appointed by the PFA." *Sprauve*, 799 F.3d at 227 (internal citations omitted). Thus, while WICO's separate incorporation would ordinarily

substantially dissociate it from the Government of the Virgin Islands, *see Maliandi*, 845 F.3d at

93, WICO's particular manner of corporate governance lessens the magnitude.

Second, "[a]n entity is more likely to be an arm of the State . . .if it lacks the ability to sue

and be sued in its own name." *Maliandi*, 845 F.3d at 94. If the instant case is any indication,

WICO certainly has the capacity to sue in its own name, an ability that the parties do not

dispute. More precisely, however, WICO is implicitly granted the ability to sue and be sued by

law. Act No. 5826, § 4, 1993 V.I. Sess. L. at 12 ("In addition to the powers granted to the

Company under this Act, the Company shall be empowered to undertake any lawful act or

activity permitted under the Company Charter and permissible for a general business

corporation under the general corporation laws of the Virgin Islands."). Since it is indisputable

that private corporations have the right to sue and be sued in their name, *see* 13 V.I.C. § 32(2),

such power is similarly granted to WICO pursuant to Act No. 5826. Therefore, this factor makes

it less likely that WICO is an arm of the Government of the Virgin Islands. *See Maliandi*, 845

F.3d at 94.

Third, the fact that WICO is immune from Virgin Islands taxation, Act No. 5826, § 8(b),

1993 V.I. Sess. L. at 13, weighs in favor of a finding that it is an arm of the Government of the

Virgin Islands, *see Karns*, 879 F.3d at 517; *Maliandi*, 845 F.3d at 95 (noting the fact that

Montclair was immune from state taxes weighed in favor of immunity).

### 3. *Other Relevant Considerations*

When evaluating an entity's status under the second *Fitchik* factor, the Third Circuit

also looks at "the entity's authority to exercise the power of eminent domain, application of

state administrative procedure and civil service laws to the entity, the entity's ability to enter

contracts and make purchases on its own behalf, and whether the entity owns its own real estate." *Karns*, 879 F.3d at 516 (quoting *Maliandi*, 845 F.3d at 91).

First, the Court is aware of no authority granting WICO the ability to exercise eminent domain by its own power. This weighs against WICO having alter-ego status. *See Maliandi*, 845 F.3d at 95. This factor, however, must be taken "with a grain of salt" because some entities not considered arms of the state may also exercise eminent domain. *Id.* (citing *Fitchik*, 873 F.2d at 663).

Second, the Court considers whether the Virgin Islands' administrative procedure and civil service laws apply to WICO as "[a]n entity's claim to immunity is stronger if it is subject to a State's administrative procedure and civil service laws." *Maliandi*, 845 F.3d at 95. WICO is exempt from the Virgin Islands procurement lawsand is instead "authorized to enter into contracts with any person, firm or corporation for the operation and maintenance of the Facilities or for consulting or advisory services in connection with the operation or maintenance of the Facilities."  Act No. 5826, § 5, 1993 V.I. Sess. Laws at 12-13. However, this finds support, as the legislative intent behind WICO's acquisition clearly contemplates streamlining WICO's activities to allow it to participate in commerce as if a private corporation, yet doing so "on behalf of the Government."  *Id.* at § 5, 8(b), 1993 V.I. Sess. Laws at 12-13.

Moreover, WICO employees are eligible for government healthcare, *see* 3 V.I.C. § 634 ("All persons in service of the Government of the United States Virgin Islands . . .whether elected, appointed, or employed, shall participate in the health insurance plan. . . .),  and WICO itself is bound by governmental accountability laws such as the Public Records Act, *see generally St. Croix Avis*, 71 V.I. 39. *See Maliandi*, 845 F.3d at 95 (noting the fact that a "significant

subset" of state college employees are subject to New Jersey's civil service laws counsels in favor of immunity). The Court therefore finds that this subfactor weighs neutrally.

Third, the Court considers WICO's ability to enter into contracts, as entities free to contract without government approval or oversight are less likely to be considered arms of the state. *Maliandi*, 845 F.3d at 95; *Bowers*, 475 F.3d at 548 (concluding the second *Fitchik* factor weighed in favor of immunity in part because "the University is unable to buy or transfer real estate without the express permission of a State Executive Council"). WICO is free to enter into contracts of its own accord, Act No. 5826, § 5, 1993 V.I. Sess. Laws at 12-13, yet does so through a board appointed at the sole discretion of the PFA board, which is appointed by the Governor with the advice and consent of the Virgin Islands Legislature, *see Sprauve*, 799 F.3d at 227 (internal citations omitted). These facts simultaneously cut both for and against WICO's arm of the state status, weighing slightly against such status in the aggregate.

Fourth, WICO can make purchases without Government approval or input, own its own real estate, and lease that real estate as it sees fit – notably, the source of the instant cause of action. *See* Act No. 5826, § 5, 1993 V.I. Sess. Laws at 12-13. However, WICO, as noted above, does so through a board appointed by the Governor's appointees. *See Sprauve*, 799 F.3d at 227 (internal citations omitted). Likewise, this subfactor weighs slightly against finding WICO to be an alter-ego of the Government of the Virgin Islands.

The Third Circuit has acknowledged that "the multifaceted nature of the status under state law factor can make it so hopelessly checkered that it does not significantly help in determining" whether an entity is an arm of the state. *Maliandi*, 845 F.3d at 91 (quoting *Fitchik*, 873 F.2d at 662) (cleaned up). Where examination of an entity's status under state law is

inconclusive, the second *Fitchik* factor "effectively drops out of [the Court's] overall Fitchik analysis." *Id.* However, this is not the case here.

The Court finds that WICO's general treatment under Virgin Islands law and immunity from taxation weigh in favor of finding WICO to be an arm of the Virgin Islands Government. Meanwhile, WICO's ability to sue and be sued in its own name, inability to exercise eminent domain, separate incorporation, ability to contract freely, and ability to own and sell real estate weigh against such a finding. One subfactor weighs neutrally. Therefore, the Court finds that the legal status factor weighs against finding WICO to be an arm of the Government of the Virgin Islands.

### C.  The Autonomy Factor

"The third factor instructs us to examine the degree to which an entity is autonomous from the state, while 'focusing on the entity's governing structure and the oversight and control exerted by a State's governor and legislature.' " *Patterson*, 915 F.3d at 955 (quoting *Maliandi*, 845 F.3d at 96). This factor asks whether an entity's autonomy is "constrained enough" by the State to be considered an arm of that state. *Maliandi*, 845 F.3d at 99.

WICO argues that WICO's board of directors is appointed by the PFA, and PFA's board of directors is appointed by the Governor, therefore making WICO not autonomous of the Government of the Virgin Islands, and a part thereof for purposes of diversity jurisdiction. ECF No. 26, at 6.

Yacht Haven counters by arguing that this is no different than a private corporation: a private corporations board of directors is elected by its shareholders, the Government of the Virgin Islands is the sole shareholder of WICO, therefore the Government of the Virgin Islands

should be expected to appoint WICO's Board. ECF No. 27, at 19. In support of its argument that WICO should not be considered an arm of the Virgin Islands Government, WICO points to the Virgin Islands Legislature's intent that WICO "should operate as a private corporation." *Id.* (quoting *V.I. Taxi Ass'n*, 66 V.I. at 493 (internal citations omitted)). Yacht Haven further points to WICO's ability to enter contracts without government approval, review of WICO's decisions under the business judgement rule, and distinguishes WICO from other government agencies. *Id.* at 19-20 (citing *V.I. Taxi Ass'n*, 66 V.I. at 492-96).

The Third Circuit's analyses in *Kovats* and *Maliandi* are useful reference points for the Court's autonomy assessment here. The *Maliandi* court concluded that MSU was not autonomous, using Rutgers and the University of Iowa as "benchmarks" for its evaluation. *Id.* at 96–99. In reaching its conclusion, the *Maliandi* court emphasized the Governor's power to appoint all members of MSU's Board of Trustees and collectively bargain on behalf of MSU's employees. *Id.* at 97. The court also stressed that Montclair was "subject to significant reporting requirements and rules for internal governance." *Id.* at 98 (noting MSU was required to "hire an independent auditor and prepare a publicly available audit, prepare an annual report on their general operations, prepare a long-range facilities plan that includes a description of the source of non-state funds, and present the Governor and legislature with an annual budget report."). The State also constrained state colleges like Montclair "by subjecting them to the Administrative Procedure Act, the State College Contracts Law, and the civil service laws." *Id.* (citations omitted). Importantly, the *Maliandi* court recognized MSU retained some autonomy but was "constrained enough" to "tip this factor in favor of immunity." *Id.* at 99.

In contrast, the Third Circuit deemed Rutgers "largely autonomous" in *Kovats*. 822 F.2d at 1311. The court focused its autonomy analysis on Rutgers' "dual governing structures"—which "evolved from Rutgers' history as a privately chartered institution"—and the school's financial independence. *Id.* Rutgers was governed by two boards, the Board of Governors and the Board of Trustees, who enjoyed a "high degree of self-government" over the school. *Id.* Roughly half of the Board of Governors were appointed by the state Governor with advice and consent of the state senate, and less than half of Rutgers' Board of Trustees were appointed by the Governor. *Id.* The court found "both boards may exercise their powers without recourse or reference to any department or agency of the state" subject only to two minimal state constraints: (1) compliance with state budget appropriations; and (2) compliance with state laws and regulations. *Id.* (citing N.J.S.A. § 18A:65-28). As to the first constraint, the fact that "individual spending decisions are not regulated beyond a requirement[s] [sic] that the state be informed of those spending decisions" was indicative of Rutgers' autonomy. *Id.* Moreover, the court noted that "Rutgers is not required to manage its funds as public moneys, but rather is free to establish accounts and invest and withdraw funds as desired." *Id.* The school was also free from the broad "operational constraints" placed on most state agencies. *Id.* (noting Rutgers "need not comply with civil service, competitive bidding or administrative procedure requirements").

WICO shares certain attributes with Rutgers and Montclair, but is more akin to Rutgers. WICO was originally established as a private corporation, only later acquired by the Government of the Virgin Islands as a means to resolve numerous "proceedings, including litigation, regarding those certain rights of the West Indian Company, Limited . . ., granted by

the Government of Denmark and confirmed by the United States in the Treaty of Cession . . .." Act No. 5826, 1993 V.I. Sess. L. at 10. While "[t]he Governor looms large" in WICO's affairs, *Maliandi*, 845 F.3d at 97, Yacht Haven correctly notes, albeit by accident without supporting authority, that the Governor's ability to indirectly appoint WICO's board of directors has little bearing on WICO's autonomy. *See Febres*, 445 F.3d at 231 ("Gubernatorial appointment of board members typically weighs only 'slightly' in favor of immunity.").

WICO submits no budget to the Virgin Islands Legislature, funding its operations entirely on its own revenue. While WICO is required to make regular revenue reports to the Virgin Islands Legislature, *see* Act No. 6530, 2002 V.I. Sess. L. 357, there is no authority that these reports lead to any legislative constraint on WICO's operations or serve any purpose aside from providing the Legislature with the means to ensure that WICO makes its required contributions to the General Fund in full. *Id.*; s*ee Maliandi*, 845 F.3d at 89-90 (concluding that because Montclair "may spend state-appropriated funds as it sees fit[,]" the requirement that the school "spend its funds within the general parameters of the State's overall budget appropriations" was a "minimal constraint" and did not indicate continued state ownership of funds allocated to MSU (citation and internal quotation omitted)). WICO may be subject to certain government oversight laws, such as the Public Records Act, but these steps toward transparency hardly rise to the level of an operational constraint. *Cf. Kovats*, 822 F.2d at 1311-12 (emphasizing that Rutgers' "boards are not subject to the operational constraints placed on most other state agencies. For example, they need not comply with civil service, competitive bidding or administrative procedure requirements.").

WICO, unlike other Virgin Islands government agencies, is "empowered to undertake any lawful act or activity permitted under the Company Charter and permissible for a general business corporation under the general corporation laws of the Virgin Islands." *St. Croix Avis*, 71 V.I. at 61 (quoting Act No. 5826, § 4, 1993 V.I. Sess. L. at 12); *see also V.I. Taxi Ass'n*, 66 V.I. at 494-96 (holding that WICO's corporate decisions are to be reviewed under the business judgment rule).

For better or worse, WICO is largely free from any meaningful government oversight, aside from the facts that its board of directors are appointed by a board of Gubernatorial appointees and that it is must present revenue reports to the Virgin Islands Legislature, presumably to ensure accurate contributions to the General Fund as no further constraints are present. As discussed *supra*, WICO is free to contract with other entities without government approval or administrative procedure, and the Government of the Virgin Islands is not liable for any debts or obligations incurred. WICO is effectively a fully autonomous public corporation, governed entirely by appointees from *another* fully autonomous public corporation. *See* 29 V.I.C. § 918. It is autonomous twice-over. Guided by *Maliandi* and *Kovats*, the Court finds that WICO is autonomous from the Government of the Virgin Islands and that the autonomy factor weighs strongly against WICO being considered an alter-ego of the Government of the Virgin Islands.

## IV. CONCLUSION

"After identifying the direction in which each factor points, [courts] balance them to determine whether an entity amounts to an arm of the State." *Maliandi*, 845 F.3d at 84. In the instant matter, the question of whether WICO constitutes an arm of the territory for diversity

purposes is clear. The funding factor and autonomy factor weigh strongly against WICO's claim of alter-ego status. The legal status factor is the most favorable factor for WICO, but still weighs against such a finding. The Court concludes that WICO is not an arm of the Government of the Virgin Islands for diversity purposes. Necessarily then, WICO has citizenship for diversity purposes, alleged to be Virgin Islands citizenship in Yacht Haven's Notice of Removal, which the Court sees no evidence to contradict. WICO's Virgin Islands' citizenship means that the parties in this case are fully diverse, and neither party disputes that the amount in controversy exceeds $75,000. Therefore, this case is properly before the Court.

A separate Order shall issue.

**Dated:** March 9, 2022                    */s/ Robert A. Molloy*
                                            **ROBERT A. MOLLOY**
                                            **Chief Judge**